UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INDUSTRIAL COMPUTING, INC., On Behalf Of Itself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA) Sdn. Bhd.; LG ELECTRONICS, INC.; LP DISPLAYS; ROYAL PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA; TOSHIBA CORPORATION; TOSHIBA MATSUSHITA DISPLAY TECHNOLOGY CO, LTD.; MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD; MT PICTURE DISPLAY CO., LTD.; HITACHI LTD.; HITACHI AMERICA LTD.; HITACHI ASIA, LTD.; PANASONIC CORPORATION OF NORTH AMERICA; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; and SAMTEL COLOR, LTD.;<br><br>Defendants. | Case No.<br><br>ECF CASE **'07 CIV 11203**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br> |

#118358

## I.    <u>INTRODUCTION</u>

1.      Plaintiff Industrial Computing, Inc. brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased products containing a cathode ray tube ("CRT Products" or "CRT") in the United States directly from one or more named defendants between January 1, 2001 and the present (the "Class Period").  Defendants are the leading manufacturers of televisions, computer monitors and other electronic devices containing CRTs.  Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the class period, virtually every household in the United States owns, or has owned, at least one CRT Product.

2.      Since the early 2000's, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  Plaintiff is informed and believes, and thereon alleges, that in order to maintain price stability, increase profitability and extend the life of the CRT market, defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States.  Plaintiff is further informed and believes, and thereon alleges, that defendants fraudulently concealed their anticompetitive conduct from plaintiff and the Class in the furtherance of the conspiracy.  As a result of defendants' unlawful conduct, plaintiff and the other members of the Class paid artificially inflated prices for CRT Products during the class period.  Such prices exceeded the amount they would have paid if the price for CRT Products had been determined by a competitive market.

1

II.    **JURISDICTION AND VENUE**

3.    Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

5.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

III.    **PARTIES**

A.    **Plaintiff**

6.    Plaintiff Industrial Computing, Inc. is a business entity incorporated under the laws of the State of Massachusetts.  Plaintiff purchased CRT Products directly from certain of the defendants and their subsidiaries during the Class Period.

B.    **Defendants**

7.    Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese corporation with its headquarters at 1127 Hopin Road, Padeh City, Taoyuan, Taiwan, R.O.C.  During the time period cover by this complaint, Chunghwa Picture Tubes Ltd. manufactured, sold and distributed CRT Products to customers throughout the United States.

8.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. is a wholly owned and controlled subsidiary of defendant Chunghwa Picture Tubes, Ltd. and is a business entity organized under the laws of Malaysia, with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park. Batu Tiga 40000 Shah Alam, Selangor, Malaysia.  During the Class Period,

2

Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. manufactured, sold and distributed CRT Products to customers throughout the United States. Chunghwa Picture Tubes, Ltd. and Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. are referred to collectively herein as "Chunghwa."

9.     Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea. LG Electronics U.S. corporate headquarters is located at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey. During the Class Period, LG Electronics manufactured, sold and distributed CRT Products to customers throughout the United States.

10.     Defendant LP Displays, formerly LG Philips Displays, was originally created in 2001 as a joint venture between LG Electronics of Korea and Royal Philips Electronics of the Netherlands. It became LP Displays effective April 1, 2007. LP Displays is organized under the laws of Hong Kong with its principal place of business at 308 Des Voeux Road Central, 6th Floor, ING Tower, Sheung Wan, Hong Kong. During the class period LP Displays manufactured, sold and distributed CRT Products to customers throughout the United States.

11.     Defendant Royal Philips Electronics N.V. ("Royal Philips") is a business entity organized under the laws of the Netherlands with its headquarters located at Amstelplein 2, Breitner Center, P.O. Box 77900, 1070 MX Amsterdam, The Netherlands. Royal Philips U.S. corporate office is located at Philips Electronics North America Corporation, 1251 Avenue of the Americas, New York, New York. During the Class Period, Royal Philips manufactured, sold and distributed CRT Products to customers throughout the United States.

12.     Defendant Philips Electronics North America (Philips America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, New York, New York. Philips America is a subsidiary of defendant Royal Philips. During the Class Period,

3

Philips America sold and distributed CRT Products manufactured by Royal Philips throughout the United States.  Defendants Royal Philips and Philips America are collectively referred to herein as "Philips."

13.     Defendant Toshiba Corporation ("Toshiba") is a business entity organized under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba's US, headquarters is located at 1251 Avenue of the Americas, Suite 4110, New York, New York.  During the Class Period, Toshiba Corporation manufactured, sold and distributed CRT Products to customers throughout the United States.

14.     Defendant Matsushita Electric Industrial Co., Ltd. is a business entity organized under the laws of Japan with its principal place of business located at 1006 Oaza Kadoma, Kadoma, Osaka 571-8501, Japan.  During the Class Period, Matsushita manufactured, sold and distributed CRT Products to customers throughout the United States.

15.     Defendant MT Picture Display Co., Ltd. formerly Matshushita Toshiba Picture Display Co., Ltd., was originally created in 2003 as a joint venture between Matshushita Electric Display Co., and Toshiba Corporation of Japan.  MT Picture Display Co., Ltd. is a wholly owned and controlled subsidiary of defendant Matsushita Electric Industrial Co., Ltd. and is a business entity organized under the laws of Japan, with its principal place of business at 1006 Oaza Kadoma, Kadoma, Osaka 571-8501, Japan.  MT Picture Display Co. Ltd's U.S. corporate office is located at 360 South Patterson Boulevard B, Dayton, Ohio.  During the Class Period, MT Picture Display Co., Ltd. manufactured, sold and distributed CRT Products to customers throughout the United States.

16.     Defendant Panasonic Corporation of North America is a wholly owned and controlled subsidiary of defendant Matsushita Electric Industrial Co., Ltd. and is incorporated in

4

Delaware with its principal place of business located at One Panasonic Way, Secaucus, New

Jersey. During the Class Period, Panasonic of North America manufactured, sold and distributed

CRT Products to customers throughout the United States. Matsushita Electric Industrial Co.,

Ltd., MT Picture Display Co., Ltd., and Panasonic of North America are referred to collectively

herein as "Matsushita."

17.    Defendant Hitachi, Ltd. is a business entity organized under the laws of Japan,

with its principal place of business at 6-1 Marunouchi Center Building 13F Chiyoda-ku, Tokyo

100-8220, Japan. During the Class Period, Hitachi Ltd. manufactured, sold and distributed CRT

Products to customers throughout the United States.

18.    Defendant Hitachi America, Ltd. is a wholly owned and controlled subsidiary of

defendant Hitachi, Ltd. and is incorporated in New York with its principal place of business at 50

Prospect Avenue, Tarrytown, New York. During the Class Period, Hitachi America, Ltd.

manufactured, sold and distributed CRT Products to customers throughout the United States.

19.    Defendant Hitachi Asia, Ltd. is a wholly owned and controlled subsidiary of

Defendant Hitachi Ltd., with its U.S. headquarters located at 575 Mauldin Road, Greenville,

South Carolina. During the Class Period, Hitachi Electronic Devices (USA), Inc. manufactured,

sold and distributed CRT Products to customers throughout the United States. Defendants

Hitachi Ltd., Hitachi America, Ltd. and Hitachi Asia, Ltd. are referred to collectively herein as

"Hitachi."

20.    Defendant Samsung SDI Co., Ltd. ("Samsung SDI") is a Korean company with

its principal place of business at 575 Shin-dong, Youngtong-gu Suwon, Kyonggi, South Korea.

Samsung SDI is one of the largest CRT producers in the world. Samsung SDI was the top

manufacturer for CRTs in 2000, with a market share of approximately 20%. During the Class

Period, Samsung SDI manufactured, sold, and distributed CRT Products throughout the United States.

21.     Defendant Samsung SDI America, Inc. ("Samsung America") is a California corporation wiht its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California.  Samsung America is a wholly-owned and controlled subsidiary of defendant Samsung SDI.  During the Class Period, Samsung America sold and distributed CRT Products manufactured by Samsung SDI throughout the United States.  Defendants Samsung SDI and Samsung America are collectively referred to herein as "Samsung."

22.     Defendant Samtel Color, Ltd. is a business entity organized under the laws of India with its principal place of business located at Village Chhapraula, Bulandshahar Road, Ghaziabad - 201009 (U.P.).  During the Class Period, Samtel Color, Ltd. manufactured, sold and distributed CRT Products to customers throughout the United States.

## IV.    AGENTS AND CO-CONSPIRATORS

23.     The acts charged in this Complaint have been done by defendants or were ordered or done by defendants' officers, agents, employees, or representatives, while actively engaged in the management of defendants' affairs.

## V.    CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action both on behalf of itself, and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the following class (the "Class").

> All persons and entities who purchased CRT Products in the
> United States directly from one or more defendants between
> January 1, 2001 and the present.  Excluded from the Class are
> defendants, their parent companies, subsidiaries and affiliates, any
> co-conspirators, all governmental entities, and any judges or
> justices assigned to hear any aspect of this action.

6

25.    The Class definition encompasses those who bought a CRT Product directly from a defendant, even if the cathode ray tube contained therein was manufactured by an affiliated entity, principal, agent, or co-conspirator.

26.    Plaintiff does not know the exact number of class members because such information is in the exclusive control of defendants.  Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely thousands of class members, geographically dispersed throughout the United States such that joinder of all class members is impracticable.

27.    Plaintiff's claims are typical of the claims of the class in that plaintiff is a direct purchaser of CRT Products, all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

28.    Numerous questions of law or fact arise from defendants' anticompetitive conduct that is common to the class, including but not limited to:

a.    Whether defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of CRT Products sold in the United States;

b.    Whether defendants engaged in a contract, combination, and/or conspiracy to restrict output of CRT Products sold in the United States;

c.    Whether defendants' conduct caused the prices of CRT Products sold in the United States to be at artificially high and noncompetitive levels;

7

d.      Whether plaintiff and the other members of the Class were injured by

defendants' conduct, and, if so, the appropriate class-wide measure of

damages for Class members; and

e.      Whether plaintiff and the other members of the Class are entitled to,

among other things, injunctive relief, and if so, the nature and extent of

such injunctive relief.

29.      These and other questions of law and fact are common to the Class, and

predominate over any questions affecting only individual Class members.

30.      Plaintiff's claims are typical of the claims of the Class because plaintiff directly

purchased CRT Products from one or more of the defendants.

31.      Plaintiff will fairly and adequately represent the interests of the Class in that

plaintiff is a direct purchaser of CRT Products and has no conflict with any other members of the

Class.  Furthermore, plaintiff has retained competent counsel experienced in antitrust, class

action, and other complex litigation.

32.      Defendants have acted on grounds generally applicable to the Class, thereby

making final injunctive relief appropriate with respect to the Class as a whole.

33.      This class action is superior to the alternatives, if any, for the fair and efficient

adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of

repetitive litigation.  There will be no material difficulty in the management of this action as a

class action.

34.      The prosecution of separate actions by individual Class members would create the

risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

defendants.

## VI.    TRADE AND COMMERCE

35.    During the Class Period, each defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

36.    During the Class Period, defendants collectively controlled a majority of the market for CRT Products, both globally and in the United States.

37.    The business activities of the defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII.    FACTUAL ALLEGATIONS

### A.    CRT Technology and Products

38.    In simple terms, a cathode ray tube consists of a vacuum tube that is coated on its inside face with light sensitive phosphors.  An electron gun at the back of the vacuum tube emits electron beams.  When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light.  A system of magnetic fields inside the CRT, as well as varying voltages, direct the beams to produce the desired colors.  This process is rapidly repeated several times per second to produce the desired images.

39.    CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

40.    Early CRT televisions displayed only black and white images.  CRT technology was revolutionized in 1950 with the advent of color CRTs.  Although there have been

9

refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is very similar to the one that RCA unveiled in 1950.

41.    The CRT industry is divided into four sectors: television and entertainment tubes; data display tubes; instrument tubes; and industrial and military tubes.  See Industry & Trade Summary: Television Picture Tubes and Other Cathode Ray Tubes (May 1995).  Because CRTs are made up of evacuated glass envelopes (which are large, deep, heavy and fragile), they are not compatible with flat plasma screens, liquid crystal display ("LCD") and other more modern technology.  The increased popularity of flat screen television models has caused a corresponding decrease in demand for CRTs in the United States.  However, due to the high cost of large LCD panels and plasma displays, a niche market for CRTs still exists as a cheaper alternative to these technologies.  In fact, although production and sales of CRTs appear to be declining in the United States, reports indicate that global sales of CRTs remain strong due to demand for traditional television sets in developing countries.

## B.    Oligopolistic Nature of the CRT Industry

42.    During the Class Period, the CRT industry has been dominated by relatively few companies.  In 2002, for example, three companies - defendants LP Displays (formerly known as LG.Philips Displays), Samsung, and Chunghwa - controlled approximately 62 percent of the CRT market.  In addition to these three companies, the other named defendants formed a substantial portion of the remaining CRT market.

//

//

//

10

#118358

| Company | Share |
|---|---|
| LG.Philips Displays | 27% |
| Samsung SDI | 24% |
| Chunghwa Picture Tubes | 11% |
| Japanese Producers[1] | 15% |
| Other | 23% |

43.     The CRT industry has undergone significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays in 2001, which was a joint venture between Philips and LG Electronics' CRT businesses; (b) the 2002 merger of Toshiba and Matsushita into Matsushita-Toshiba; and (c) Orion's agreement to manufacture CRT Products for Toshiba, which effectively took Toshiba's capacity out of the market.

44.     This concentration of market share facilitated defendants' ability to implement the conspiracy.  Involvement in long-standing joint ventures, both in the CRT market and closely related markets, also gave these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information.  The mutually beneficial nature of the business relations between certain defendants not only provided the opportunity to conspire; it also created a financial incentive to do so.

**C.     High Level of Cooperation in the CRT Industry**

45.     The CRT industry is marked by a high degree of cooperation among supposed competitors.  As stated above, many of the major competitors have joint ventures that involve other competitors, either in the CRT market or in closely related markets.  Additionally, several of the major players obtain CRTs from the same Indian company – defendant Samtel.

---

[1]  "Japanese Producers" includes defendants Hitachi and Toshiba.

11

46.     One of the most striking examples of cooperation between competitors in the CRT market involves the non-defendant, TPV Holdings, Inc. ("TPV").  TPV bills itself as the world's largest producer of CRT monitors.  TPV has a series of joint ventures with defendant Philips, which, as alleged above, has joint ventures with defendant LG.  In addition, TPV also has joint ventures with defendant CPT and another major Taiwanese manufacturer, HannStar.

47.     Defendant Chunghwa, in turn, has a long-standing joint venture with defendant Samsung's corporate parent for the production of liquid crystal display panels.  Defendant Chunghwa now licenses technology from defendant Philips, although this is a recent development that helped resolve a patent infringement suit filed in 2002.

48.     Defendant LG Electronics and Hitachi, Ltd. entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

49.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with defendant Samsung's corporate parent and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

50.     Furthermore, at least four of the competitors obtain picture tubes from the same Indian company.  Defendant Samtel claims to have supplied CRTs to defendants LG, Samsung, Philips, and Matsushita during at least part of the Class Period.

51.     In addition to these formalized business relationships, defendants maintain close relationships through common membership in trade associations.  For example, defendants Chunghwa, Hitachi, and Samsung are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, defendants LG Electronics, LP Displays (formerly LG.Philips Displays), and Samsung are members of the Electronic Display Industrial Research Association.

12

Defendants used these common memberships as vehicles for discussing, and agreeing upon, their pricing for CRT Products. In particular, defendants, through these trade associations, and in meetings related to these trade associations, shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

### D.    The Impact of Emerging Flat Panel Technologies

52.    CRT televisions require a deep cabinet to accommodate the vacuum tube assembly. In the 1990s, technological innovations allowed companies to introduce flat panel displays that would be slimmer and less bulky than CRT displays. Flat panel displays were introduced in consumer products such as computer monitors and televisions. Before their introduction, CRTs had dominated the market for these applications.

53.    As the established technology, CRTs had a price advantage over these new technologies. Unlike an emerging industry where participants must invest heavily in research, development, and bringing capacity online, the CRT industry made and recouped such investments well before the start of the Class Period. Thus, CRT manufacturers had very little debt or interest expense on their facilities, and the pressure to produce at full capacity (to avoid default) was lessened. This provided an environment in which collusion to fix prices, even at the risk of lower demand, was possible.

54.    The CRT industry faced significant market pressures and reduced profitability during the Class Period. As stated in a September 25, 2001 article entitled *Report: CRT Revenue to plunge*:

> After decades of growth, revenue from cathode ray tube monitors is expected to drop significantly over the next several years ... 'A combination of price erosion, a slowing in the movement to large screens, and a gradual shift in market opportunities from developed

13

> regions to developing regions is causing the drop in revenue,'
> Stanford Resources analyst Rhonda Alexander said Tuesday. The
> growing popularity of flat panel monitors will also have an effect
> on CRT revenue.

Shim, Richard, *Report: CRT Revenue to plunge*, ZDNet News (Sep 25, 2001) (*available at*

http://news.zdnet.com/2100-9595_22-812906.html) (last viewed on November 13, 2007).

55.    In 2006, market research firm iSuppli Corp. predicted that sales of LCD

televisions in 2007 would, for the first time, surpass sales of CRT televisions. The firm

forecasted that sales of CRTs would fall from an estimated 14.4 million units in 2006 to 10.4

million units in 2007. iSuppli predicted that CRT televisions would account for only 2.l million

of the 44 million televisions sold in 2010.

56.    CRTs still remain popular in schools and other public areas for their combination

of price and durability, as well as in developing countries like China. CRT technology is also

holding its own in the area of low-cost monitor and smaller size televisions. According to

DisplaySearch Inc., a Texas based research firm, CRTs will maintain a 65 percent share of 25-

inch to 29-inch displays sold in 2009, whereas CRTs will have only a 1 percent share of 35-inch

to 39-inch displays sold in 2009.

57.    DisplaySearch Inc. further estimates that the worldwide capacity to manufacture

CRTs will fall from over 250 million units in 2006 to less than 150 million units by 2010. At

various times during the conspiracy, in order to keep prices high, defendants colluded to restrain

output of CRTs as alleged below.

     **E.**    **Reductions in Manufacturing Capacity by Defendants**

58.    During the Class Period, the defendants herein consolidated their manufacturing

facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up

prices.

14

59.     On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five years after the plant was opened. The plant's closure resulted in a loss of capacity to manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the principal applications for CRTs during this time period.

60.     In December 2004, Toshiba announced that it too would discontinue manufacturing traditional CRT televisions.

61.     In July 2005, Philips ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

62.     In December 2005, Matsushita-Toshiba announced it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

63.     In July 2006, Matsushita announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### F.     Defendants Collude on Prices for CRTs

64.     Plaintiff is informed and believes, and thereon alleges, that in order to control and maintain profitability during declining demand for CRTs, defendants conspired to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States at artificially inflated and anticompetitive levels.

65.     Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the

15

average electronic display to about $50 in 1997." Information Display 9/92 p. 19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

66.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

67.    In reality, consumer prices for CRT monitors never approached $50 in 1997, and were consistently more than double this price.

68.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

69.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

70.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst defendants.

71.    After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 200 article in *Infotech*

*Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

72.    On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India. This price hike was falsely attributed to a shortage of glass needed to manufacture CRTs.

73.    Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. And yet, CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by defendants exchanging information about their prices, price moves, contract prices to large customers; capacity, capacity utilization, as well as technological and manufacturing advances. These discussions amongst defendants occurred through e-mail communications, telephone calls, and in person meetings. This price stability for the period of 2004 to 2007 is depicted in the following charts of average sale prices ("ASP"):

//

//

//

//

17

**ASP of Small (10" - 21") SD CRTs Sold in North America**



**ASP of Medium (22" - 29") SD CRTs Sold in North America**



18

G.    **International Antitrust Investigations**

74.    Defendants have been the subject of multiple government investigations for their cartel activity in recent years.  For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the United States Department of Justice ("DOJ") into price-fixing among manufacturers of dynamic random access memory ("DRAM") computer chips.  In addition, Samsung, Hitachi and Toshiba have all acknowledged being contacted by the DOJ as part of an ongoing investigation into collusion among manufacturers of static random access memory ("SRAM") computer chips.

75.    More recently, the DOJ has commenced an investigation of Samsung, Toshiba and Hitachi, among others, concerning collusion among manufacturers of thin film transistor liquid crystal display ("TFT-LCDs") and flash memory computer chips.

76.    Plaintiff is informed and believes, and thereon alleges, that defendants are currently under investigation by government authorities around the world for anticompetitive conduct in connection with the CRT industry.  Plaintiff is further informed and believes, and thereon alleges, that the US investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of California.

77.    On November 8, 2007, *Bloomberg.com* reported that European Commission officials carried out unannounced raids on manufacturers of CRTs based on suspected anticompetitive conduct.  That same day, the European Commission issued a press release stating that, "The commission has reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets or exchanging market information."  *See* Newman, Matthew, *EU, Japan Raid Cathode-Ray Tube Makers in Cartel Case*, bloomberg.com

(November 8, 2007) (*available at*

http://www.bloomberg.com/apps/news?pid=email_en&refer=japan&sid=aEJ8N7GKCk8I).

78.     On November 9, 2007, defendants Matsushita Electric and Samsung reported that

they were cooperating with Japanese antitrust authorities who reportedly raided the companies'

CRT production facilities on suspicion of anticompetitive conduct.  *See* Soble, Jonathan and

Song, Jung-a, *Matsushita and Samsung Under Investigation*, Financial Times (November 9,

2007) (*available at* http://www.ft.com/cms/s/0/c5237446-8e72-11dc-8591-0000779fd2ac.html).

79.     Similarly, on November 12, 2007, defendant Chunghwa announced that it had

received a summons from the DOJ for involvement in a CRT price-fixing cartel.  *See* Chuang,

Emily, *CPT Receives Notification of CRT Price-Fixing Matter in US*, Digitimes (November 12,

2007) (*available at* http://www.digitimes.com/print/a20071112PM200.html).

80.     Finally, on November 21, 2007, defendant Philips acknowledged that it is being

investigated as well.  The *International Herald Tribune* reported that "competition authorities in

several jurisdictions had started investigations," and that the company "would assist regulators."

### H.     Effects of Defendants' Antitrust Violations

81.     The above combination and conspiracy has had the following effects, among

others, during the Class Period:

>     a.     Price competition in the sale of CRT Products by defendants and their co-
>     conspirators has been restrained, suppressed and eliminated throughout the
>     United States;
>
>     b.     Prices for CRT Products sold by defendants has been raised, fixed,
>     maintained and stabilized at artificially high and noncompetitive levels
>     throughout the United States; and

20

c.  Direct purchasers of CRT Products from defendants have been deprived of the benefit of free and open competition in the purchase of CRT Products.

82.  As a direct and proximate result of the unlawful conduct of defendants, plaintiff and other members of the class have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of defendants.

I.  **Fraudulent Concealment**

83.  Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief despite diligence in trying to discover the pertinent facts. Plaintiff and members of the Class did not discover, and could not have discovered the conspiracy to fix prices for CRTs alleged herein.

84.  Plaintiff is informed believes and thereon alleges that defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the nature of the scheme and gave pretextual justifications for the inflated prices of CRTs in furtherance of the conspiracy.

85.  As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst defendants, which was undisclosed at the time.

86.  As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 2001. This price stabilization was purportedly due to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

21

#118358

87.    In addition, when several CRT manufacturers, including defendants Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "This shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."  *See* Das, Shilpi, *Major Monitor Manufacturers hike CRT prices, LG follows Suit* (May 26, 2004) (available at http://www.techtree.com/India/News/Major_Monitor_Manufacturers_hike_CRT_prices_LG_foll ows _Suit/551-52715-581.html) (*last viewed on* November 19, 2007).

88.    Plaintiff is informed believes and thereon alleges that defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing defendants' anti-competitive scheme as alleged herein.  As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that plaintiff and the Class members have as a result of the anticompetitive conduct alleged herein.

## VIII.   CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

89.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

90.    Beginning at least as early as January 1, 1995, the exact date being unknown to plaintiff and exclusively within the knowledge of defendants, defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for CRT Products in the United States.

#118358

91.    In particular, defendants have combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

92.    As a result of defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

93.    The contract, combination or conspiracy among defendants consisted of a continuing agreement, understanding and concerted action among defendants and their co-conspirators.

94.    For purposes of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.    Participating in meetings and conversations to discuss the prices and supply of CRT Products;

b.    Communicating in writing and orally to fix prices;

c.    Agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.    Issuing price announcements and price quotations in accordance with the agreements reached;

e.    Selling CRT Products to customers in the United States at noncompetitive prices; and

f.    Providing false statements to the public to explain increased prices for CRT Products.

23

95.     As a result of defendants' unlawful conduct, plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for CRT Products than they otherwise would have paid in the absence of defendants' unlawful conduct.

## IX.     DAMAGES

96.     During the Class Period, plaintiff and the other members of the class purchased CRT Products directly from defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations.  As a result, plaintiff and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

## X.     PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.     This action may proceed as a class action, with plaintiff as the designated Class representative and its counsel as Class Counsel;

B.     Defendants have engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violations;

C.     Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of plaintiff and the Class be entered against the defendants in an amount to be trebled in accordance with such laws;

#118358

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.      Plaintiff and members of the Class be awarded pre-judgment and postjudgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## XI.      **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: December 13, 2007                    KLAFTER & OLSEN LLP
                                            JEFFREY A. KLAFTER (JK-0953)

                                            _____/s/ Jeffrey A. Klafter_____
                                            1311 Mamaroneck Avenue, Suite 220
                                            White Plains, NY  10605
                                            Telephone:  (914) 997-5656
                                            Facsimile: (914) 997-2444
                                            Email: jak@klafterolsen.com

GOLD BENNETT CERA & SIDENER LLP
Paul F. Bennett
Steven O. Sidener
Joseph M. Barton
595 Market Street, Suite 2300
San Francisco, California 94105-2835
Telephone: (415) 777-2230
Facsimile: (415) 777-5189
Email: pfb@gbcslaw.com
Email: ssidener@gbcslaw.com
Email: jbarton@gbcslaw.com

Attorneys for Plaintiff Industrial Computing, Inc.
and All Others Similarly Situated



JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 27 2008

FILED
CLERK'S OFFICE

**A CERTIFIED TRUE COPY**

MAR 1 4 2008

ATTEST
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

MDL No. 1917

C 07- 5944 SC

(SEE ATTACHED SCHEDULE)

DISTRICT COURT FILED

MAR 2 0 2008

S.D. OF N.Y.

#12

**FILED**

MAR 1 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**CONDITIONAL TRANSFER ORDER (CTO-1)**

On February 15, 2008, the Panel transferred one civil action to the United States District Court for the Northern District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* ___F.Supp.2d___ (J.P.M.L. 2008). With the consent of that court, all such actions have been assigned to the Honorable Samuel Conti.

It appears that the actions on this conditional transfer order involve questions of fact that are common to the action previously transferred to the Northern District of California and assigned to Judge Conti.

Pursuant to Rule 7.4 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation</u>, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Northern District of California for the reasons stated in the order of February 15, 2008, and, with the consent of that court, assigned to the Honorable Samuel Conti.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Northern District of California. The transmittal of this order to said Clerk shall be stayed 15 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 15-day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

Inasmuch as no objection is
pending at this time, the
stay is lifted.

MAR 1 4 2008

CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

I hereby certify that the present
instrument is a true and correct copy
of the original on file in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By_____
Deputy Clerk
Date 03/18/08

**IN RE: CATHODE RAY TUBE (CRT)**
**ANTITRUST LITIGATION**                              MDL No. 1917

## SCHEDULE CTO-1 - TAG-ALONG ACTIONS

**DIST. DIV. C.A. #**            **CASE CAPTION**

ARKANSAS WESTERN
  ARW 5  08-5013        Jerry Cook v. Chunghwa Picture Tubes, Ltd., et al.

ARIZONA
  AZ  2  08-55           Brian A. Luscher, et al. v. Chunghwa Picture Tubes, Ltd., et al.

MINNESOTA
  MN  0  07-4889         Wettstein & Sons, Inc., etc. v. Chunghwa Picture Tubes, Ltd., et al.
  MN  0  08-160          Barry Kushner, et al. v. Chunghwa Picture Tubes, Ltd., et al.

NEW JERSEY
  NJ  2  07-5713         Princeton Display Technologies, Inc. v. Chunghwa Picture Tubes, Ltd., et al.
  NJ  2  08-39           Royal Data Services, Inc. v. Samsung Electronics Co., Ltd., et al.
  NJ  2  08-86           OK TV & Appliances, LLC v. Samsung Electronics Co., Ltd., et al.

NEW YORK SOUTHERN
  NYS  1  07-10664       Arch Electronics, Inc. v. LG Electronics, Inc., et al.
  NYS  1  07-10674 GBD  Meijer, Inc., et al. v. LG Electronics, Inc., et al.
  NYS  1  07-11203       Industrial Computing, Inc. v. Chunghwa Picture Tubes, Ltd., et al.

OHIO NORTHERN
  OHN  1  08-62          Southern Office Supply, Inc. v. Chunghwa Picture Tubes, Ltd., et al.

SOUTH CAROLINA
  SC  4  07-4175         Greg A. Glanz v. Chunghwa Picture Tubes, Ltd., et al.

TENNESSEE EASTERN
  TNE  2  08-11          Charles Benson v. Chunghwa Picture Tubes, Ltd., et al.

VERMONT
  VT  2  08-5           Margaret Slagle v. Chunghwa Picture Tubes, Ltd., et al.

**United States District Court**
Southern District of New York
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

**Date:**     **03/25/2008**

**Our case #:** 07-11203

Dear Sir/Madam,

Pursuant to an order issued by the MDL panel the above fore mentioned case is being transferred from the Southern District of New York to the Northern District of California. Included with this letter you will find pdf version of the transfer order, docket sheet as well as the initiating documents.

Cases that are designated ECF can be accessed through our CM/ECF System for the Southern District of New York.  Please contact either Martine Jocelyn at 212-805-0738 or Deborah Wooten at 212-805-0746 for the CM/ECF Login and Password.

The included copy of this letter is for your convenience in acknowledging receipt of these documents. Please contact the case openings unit at 212-805-0632 if you have any questions regarding these cases.

Yours truly,

J. Michael McMahon
Clerk of Court

By: <u>Jenny R. Horne</u>
     Deputy Clerk

Via: email

---

**RECEIPT IS ACKNOWLEDGED OF THE DOCUMENTS DESCRIBED HEREIN AND ASSIGNED CASE NUMBER:**

CASE #_____ON DATE: _____

<u>CASE TRANSFERRED OUT FORM</u>

| | |
|---|---|
| INDUSTRIAL COMPUTING, INC. | Plaintiff, |
| -v- | |
| CHUNGHWA PICTURE TUBES, LTD., et al. | Defendant. |

'07 CIV 11203

Case No._____



Rule 7.1 Statement

FILED

DEC 13 2007

USDC WP SDNY

Pursuant to Federal Rule of Civil Procedure 7.1 [formerly Local General Rule 1.9] and to enable District Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for

Industrial Computing, Inc. _____ (a private non-governmental party)

certifies that the following are corporate parents, affiliates and/or subsidiaries of said party, which are publicly held.

NONE

**Date:** 12/13/07 _____

_Jeffrey Klafter_
**Signature of Attorney**

**Attorney Bar Code:** JK-0953

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:07–cv–11203–GBD
### *Internal Use Only*

Industrial Computing, Inc. v. Chunghwa Picture Tubes, Ltd. et al
Assigned to: Judge George B. Daniels
Related Case:  1:07–cv–10664–GBD
Cause: 15:1 Antitrust Litigation

Date Filed: 12/13/2007
Date Terminated: 03/20/2008
Jury Demand: None
Nature of Suit: 410 Anti–Trust
Jurisdiction: Federal Question

**Plaintiff**

**Industrial Computing, Inc.**
*on behalf of itself and all others similarly situated*

represented by **Jeffrey Alan Klafter**
Klafter &Olsen LLP
1311 Mamaroneck Avenue, Suite 220
White Plains, NY 10602
(914) 997–5656
Fax: (914) 997–5656
Email: jak@klafterolsen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Chunghwa Picture Tubes, Ltd.**

**Defendant**

**Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.**

**Defendant**

**LG Electronics, Inc.**

**Defendant**

**LP Displays**

**Defendant**

**Royal Philips Electronics North America**

**Defendant**

**Philips Electronics North America**

**Defendant**

**Toshiba Corporation**

**Defendant**

**Toshiba Matsushita Display Technology Co., Ltd.**

**Defendant**

**Matsushita Electric Industrial Co., Ltd.**

**Defendant**

**MT Picture Display Co., Ltd.**

**Defendant**

**Hitachi Ltd.**

**Defendant**

**Hitachi America Ltd.**

**Defendant**

**Hitachi Asia, Ltd.**

**Defendant**

**Panasonic Corporation of North America**

**Defendant**

**Samsung SDI Co., Ltd.**

**Defendant**

**Samsung SDI America, Inc.**

**Defendant**

**Samtel Color Ltd.**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/13/2007 | o 1 | COMPLAINT against Matsushita Electric Industrial Co., Ltd., MT Picture Display Co., Ltd., Hitachi Ltd., Hitachi America Ltd., Hitachi Asia, Ltd., Panasonic Corporation of North America, Samsung SDI Co., Ltd., Samsung SDI America, Inc., Samtel Color Ltd., Chunghwa Picture Tubes, Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., LG Electronics, Inc., LP Displays, Royal Philips Electronics North America, Philips Electronics North America, Toshiba Corporation, Toshiba Matsushita Display Technology Co., Ltd.. (Filing Fee $ 350.00, Receipt Number 633639)Document filed by Industrial Computing, Inc.(laq) (mbe). (Entered: 12/14/2007) |
| 12/13/2007 | o | SUMMONS ISSUED as to Matsushita Electric Industrial Co., Ltd., MT Picture Display Co., Ltd., Hitachi Ltd., Hitachi America Ltd., Hitachi Asia, Ltd., Panasonic Corporation of North America, Samsung SDI Co., Ltd., Samsung SDI America, Inc., Samtel Color Ltd., Chunghwa Picture Tubes, Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., LG Electronics, Inc., LP Displays, Royal Philips Electronics North America, Philips Electronics North America, Toshiba Corporation, Toshiba Matsushita Display Technology Co., Ltd.. (laq) (Entered: 12/14/2007) |
| 12/13/2007 | o | CASE REFERRED TO Judge Loretta A. Preska as possibly related to 07−cv−10664. (laq) (Entered: 12/14/2007) |
| 12/13/2007 | o 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Industrial Computing, Inc.(laq) (mbe). (Entered: 12/14/2007) |
| 12/13/2007 | o | Case Designated ECF. (jeh) (Entered: 03/25/2008) |
| 01/02/2008 | o | CASE ACCEPTED AS RELATED. Create association to 1:07−cv−10664−GBD. Notice of Assignment to follow. (jeh) (Entered: 01/09/2008) |
| 01/02/2008 | o 5 | NOTICE OF CASE ASSIGNMENT to Judge George B. Daniels. Judge Unassigned is no longer assigned to the case. (jeh) (Entered: 01/09/2008) |

| 01/09/2008 | o 3 | INITIAL PRETRIAL CONFERENCE: Initial Conference set for 4/2/2008 at 09:30 AM in Courtroom 15D, 500 Pearl Street, NY 10007 before Judge George B. Daniels. (Signed by Judge George B. Daniels on 1/8/08) (pl) (Entered: 01/09/2008) |
|---|---|---|
| 01/09/2008 | o 4 | STIPULATION RE EXTENSION OF TIME FOR DEFENDANT TO ANSWER, MOVE, OR OTHERWISE RESPOND TO PLAINTIFFS COMPLAINT: The deadline for defendant PNA to answer, move, or otherwise respond to the complaint shall be extended until the earliest of the following dates: (1) 45 days after the filing of a Consolidated Amended Complaint in the CRT Cases; or (2) 45 days after plaintiff provides written notice to PNA that plaintiff does not intend to file a Consolidated Amended Complaint, provided, however, that in the event that PNA should agree to an earlier response date in any CRT case, PNA will respond to the Complaint in this action on that earlier date as further set forth in said Order. (Signed by Judge Charles S. Haight, part I on 1/9/08) (db) (Entered: 01/09/2008) |
| 02/15/2008 | o 6 | ACKNOWLEDGMENT OF SERVICE of Complaint served on Hitachi America Ltd. on December 19, 2007. Service was accepted by Becky DeGeorge/Reg. Agent. Document filed by Industrial Computing, Inc.. (Klafter, Jeffrey) (Entered: 02/15/2008) |
| 02/15/2008 | o 7 | AFFIDAVIT OF SERVICE of Complaint served on Hitatchi Asia, Ltd. on December 19, 2007. Service was accepted by Becky DeGeorge/Reg. Agent. Document filed by Industrial Computing, Inc.. (Klafter, Jeffrey) (Entered: 02/15/2008) |
| 02/15/2008 | o 8 | AFFIDAVIT OF SERVICE of Complaint served on LG ELECTRONICS, INC. on December 19, 2007. Service was accepted by Becky DeGeorge/Reg. Agent. Document filed by Industrial Computing, Inc.. (Klafter, Jeffrey) (Entered: 02/15/2008) |
| 02/15/2008 | o 9 | AFFIDAVIT OF SERVICE of Complaint served on PHILIPS ELECTRONICS NORTH AMERICA CORPORATION on December 19, 2007. Service was accepted by Becky DeGeorge/Reg. Agent. Document filed by Industrial Computing, Inc.. (Klafter, Jeffrey) (Entered: 02/15/2008) |
| 02/15/2008 | o 10 | AFFIDAVIT OF SERVICE of Complaint served on ROYAL PHILIPS ELECTRONICS N.V. on December 19, 2007. Service was accepted by Becky DeGeorge/Reg. Agent. Document filed by Industrial Computing, Inc.. (Klafter, Jeffrey) (Entered: 02/15/2008) |
| 02/15/2008 | o 11 | AFFIDAVIT OF SERVICE of Complaint served on SAMSUNG SDI AMERICA, INC. on DECEMBER 21, 2007. Service was accepted by Diana Kim/ Agent for Service of Process. Document filed by Industrial Computing, Inc.. (Klafter, Jeffrey) (Entered: 02/15/2008) |
| 03/20/2008 | o 12 | CERTIFIED TRUE COPY OF CONDITIONAL MDL TRANSFER OUT ORDER FROM THE MDL PANEL...transferring this action from the U.S.D.C. – S.D.N.Y to the United States District Court – Northern District of California. (Signed by MDL Panel on 02/27/2008) (jeh) (Entered: 03/25/2008) |
| 03/20/2008 | o | MDL TRANSFER OUT: Emailed documents numbered 1–2, certified copy of docket entries and transfer order along with letter of acknowledgment to the United States District Court – Northern District of California. (jeh) (Entered: 03/25/2008) |